[Cite as *In re M.W.*, 2016-Ohio-4891.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE:  M.W.

:
:
:   C.A. CASE NO.   26912
:
:   T.C. NO.   2013-5706
:
:   (Civil appeal from Common Pleas
:    Court, Juvenile Division)
:
:

. . . . . . . . . .

**O P I N I O N**

Rendered on the \_\_\_8th\_\_\_ day of \_\_\_July\_\_\_, 2016.

. . . . . . . . . .

MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

JEFFREY D. LIVINGSTON, Atty. Reg. No. 0062466, 120 W. Second Street, Suite 2000, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of A.B., filed November 6, 2015.  A.B. appeals from the decision of the juvenile court that overruled her objections to the Magistrate's decision granting custody of her son, M.W., to his father, J.W.  M.W. was born in January of 2007. We hereby affirm the judgment of the juvenile

court.

**{¶ 2}** On August 12, 2013, Montgomery County Children's Services ("MCCS") filed a Dependency Complaint alleging that M.W. was dependent "due to Mother's substance abuse and criminal charges involving illegal substances." According to the complaint, A.B. "was arrested for felony drug possession when the Mother and her paramour were pulled over by police. Inside the vehicle the police found drugs and cash as well as the Child and his sibling in the back seat." The complaint further alleged that A.B. "has been previously imprisoned on drug possession charges. Mother's current charges may result in her going to prison for a long term, possibly five to seven years." The complaint provides that M.W. and his sibling reside with their maternal grandparents, and that the maternal grandmother "filed for a grandparent caretaker authorization affidavit and had it stamped by the juvenile court on March 20, 2013." The complaint provides that J.W. "has had very little involvement" with M.W. but has met with the caseworker multiple times and is interested in obtaining custody of the child.

**{¶ 3}** On August 27, 2013, following a hearing, the Magistrate issued a decision granting interim custody of M.W. to J.W., and granting supervised parenting time to A.B. The decision provides in part as follows:

> * * * The mother has significant substance abuse problems that have not been addressed. The mother has housing issues that have not been addressed. The mother is reportedly incarcerated and did not appear at the hearing. The father was present and indicated that he wants custody of the child. [MCCS] has seen the father's home and indicated that the home was appropriate. * * *

{¶ 4} On October 11, 2013, J.W. filed "Father's Motion for Legal Custody." Therein he asserted that "despite allegations in the Complaint, he has been involved with the child since birth." J.W. asserted that he "has stable housing, employment, and can meet the needs of the child. He has been compliant with caseworkers and the maternal relatives with regards to visitation. The child has been doing well in his home since Interim Temporary Custody has been granted." J.W. asserted that A.B. "is currently unable to care for the child and will be for the foreseeable future." Father asserted that a grant of custody to him is in the best interest of M.W.

{¶ 5} On November 5, 2013, A.B. filed a "Motion for in camera Interview." Therein she requested that the in camera interview occur at the dispositional hearing. On the same date, A.B. filed "Mother's Motion for TC to Maternal Grandparents." Therein she asserted that M.W. and his sibling, J.C., "were placed with Maternal Grandparents in March of 2013 pursuant to a Grandparent Caretaker Authorization Affidavit. Maternal Grandparents were meeting the children's basic needs. Maternal Grandparents attempted to get M.W. enrolled in counseling, but Legal Father * * * did not see the need." According to A.B., "Maternal Grandparents have housing and income to provide for the child and the child's sibling. Mother believes it is in both children's interest to be placed together." A.B. asserted that since J.W. "has been given interim custody of M.W., the plan was for M.W. to spend every other weekend with Maternal Grandparents. However, [J.W.] often does not return phone calls from Maternal Grandmother. [J.W.] is rarely home when Maternal Relatives pick up and drop off M.W." According to A.B., often only "Paternal Grandmother" is home with M.W. A.B. asserted that she pled guilty "in her federal criminal case and is awaiting sentencing," and that she expects to receive

probation. Finally, on November 5, 2013, the Magistrate issued an order granting the motion for an in camera interview of M.W. and scheduled the interview for November 7, 2013, the same date set for the dispositional hearing.

{¶ 6} On November 7, 2013, the "Report and Recommendations of Guardian ad Litem" ("GAL") were filed. The GAL noted that M.W was "conflicted" when discussing where he wanted to reside and indicated that "this GAL is uncertain what [M.W.'s] true desire is." The GAL noted that M.W. and J.C. were "unhappy living separated," and he recommended that temporary custody of both children should be awarded to the maternal grandmother, with J.W. receiving unsupervised visitation every other weekend.

{¶ 7} On December 5, 2013, following a hearing, a "Magistrate's Decision and Judge's Order of Adjudication and Disposition of Temporary Custody" was issued. The order provides in part as follows: "For good cause shown and the Court finding that it appears to be in the child's best interests, orders that temporary custody be and hereby is granted to the father, [J.W.], * * * pursuant to the evidence presented and the recommendation of the [GAL]. Temporary custody will expire on August 12, 2014."

{¶ 8} On June 10, 2014, a "Motion and Affidavit for Legal Custody to Legal Father with an Alternative of First Extension of Temporary Custo[dy] to Legal Father" was filed by MCCS. On August 4, 2014, the Magistrate granted the motion, and it ordered that A.B.'s parenting time "shall be as agreed upon between the parties, but shall not include overnights unless approved by both the [GAL] and the [MCCS] caseworker." The Magistrate ordered that the first extension of temporary custody would expire on February 12, 2015.

{¶ 9} On December 17, 2014, a "Motion and Affidavit for Legal Custody to Legal

Father" was filed by MCCS, and the Magistrate set the matter for a hearing on March 11, 2015. On March 11, 2015, the GAL also filed a "Report and Recommendations of Guardian ad Litem." Therein the GAL noted that he "has observed that [M.W.'s] bonding and affection with Father has strengthened significantly since temporary custody was placed with Father." The GAL further noted as follows:

This GAL interviewed [M.W.] one-on-one regarding his wishes about which parent he would want to live with more if given the choice. [M.W.] responded without hesitation that he would choose living with Father and visiting with Mother.

When asked follow up questions relating to whether his choice would change if Father moved into the new apartment, which [M.W.] has seen, [M.W.] emphasized that he was actually very excited about the opportunity to move into the new apartment and have a bedroom of his own. [M.W.] further stated that he was excited about being able to share the apartment with just Father.

* * *

{¶ 10} At the hearing, Lori Lindeman testified that she is a caseworker at MCCS, and that she has been involved with M.W. since December 2013. Lindeman stated that there is a case plan for A.B. and J.W., and that both parents have seen and understand the case plan. According to Lindeman, A.B.'s case plan objectives "were that she was not to engage in any criminal activity; she was to comply with her probation officer; comply with mental health treatment; obtain employment; and obtain stable, safe, independent housing." Lindeman stated that A.B. was incarcerated when Lindeman received the case.

Lindeman testified that A.B. was released from jail in May of 2014, and since that time "there ha[ve] not been any new criminal charges." Upon her release, according to Lindeman, A.B. "was placed on intensive probation" which she successfully completed. Lindeman testified that A.B. "now is on regular probation, where she reports to her probation officer once a month."

{¶ 11} Lindeman stated that A.B. was referred to Day-Mont West for mental health counseling, and that bi-weekly counseling was recommended. According to Lindeman, A.B. "has not been involved with mental health counseling since November." Lindeman testified that "my understanding when talking with Day-Mont, they had switched counselors on [A.B.]. [A.B.] had not been able to schedule appointments, didn't know who her therapist was." Lindeman testified that A.B. has contacted South Community "and started the paperwork process of it. As of a week and a half ago, when I spoke with [A.B.], there was no appointment scheduled yet with South Community." Lindeman stated that the mental health objective is "ongoing."

{¶ 12} Regarding housing, Lindeman stated that A.B. resides with her mother and stepfather and that the "housing itself is safe," but "quite a few people live in the home," including, in addition to M.W., A.B.'s adult sister, two of A.B.'s stepfather's children from a previous relationship, and A.B.'s two oldest children and daughter, J.C., for a total of four adults and five children. Lindeman stated that the housing objective is not complete because A.B. "hasn't established her own stable housing." She stated that the home where A.B. resides has four bedrooms, "and then they have the garage that they've converted over to another bedroom, which is where [M.W.] stays at." Lindeman testified that M.W. "does not have a bed when he stays there. [M.W.] sleeps on the floor,

according to him, when he goes there."

{¶ 13} Regarding income, Lindeman testified that A.B. began working at "A-1 * * * and she works Monday through Friday," and that she has been there for "a little over a month." Lindeman stated that A.B. previously worked two jobs at a McDonald's and a Marathon gas station, both in Kettering. Lindeman stated that she has not seen A.B.'s pay stubs for her new job. When asked if A.B. earned enough income to support M.W., Lindeman stated that there "are concerns in regards to the income." According to Lindeman, when J.C. was returned to A.B.'s care, MCCS purchased a twin bed for the child because the child was sharing a queen-size bed with A.B. Lindeman stated that she understood that A.B. and the child now share the twin bed because A.B. "had gotten rid of the queen-size bed that she had because it was on a rent to own and could no longer afford the payments."

{¶ 14} Regarding drug use, Lindeman stated that she has not observed anything that would lead her to believe that A.B. is using drugs. When asked about A.B.'s overall progress on her case plan, Lindeman replied, "It's sufficient; however * * * my concerns are the housing, the amount of people that are living in that house, [M.W.] not having * * * his own bed * * * even a place to sleep when he goes over there."

{¶ 15} Lindeman stated that J.W.'s case plan objectives were to "maintain housing; meet [M.W.'s] basic needs, to include the food, shelter, educational needs, medical needs; and maintain employment," and make sure that M.W. attends school on a regular basis. Lindeman testified that J.W. and M.W. currently reside with J.W.'s mother and stepfather, but that J.W. "does have a two-bedroom apartment, and I was out at the apartment last night. It does not have the furnishings in it yet, but it does have the

working utilities.  He's in the process of getting some furniture for the home, but he does have stable, secure housing." Lindeman further testified that M.W. has his own bedroom in the home he currently shares with his father and J.W.'s mother and stepfather, and that the home is safe and appropriate.

{¶ 16} Lindeman stated that J.W. is employed, and when asked if his income is sufficient to meet M.W.'s needs, Lindeman responded that J.W. earns "about 1200 per month, and his rent would be about 600, so yes, he will." She stated that J.W. ensures that M.W. attends school and has taken the child to his medical and dental appointments. Lindeman testified that J.W. has "been successful with his case plan objectives."  She stated that all of M.W.'s needs are being met in his father's care and that M.W. does not have any special needs.

{¶ 17}  Lindeman stated that visitation "had been going well up until our last court hearing.  Since the last court hearing, there has been some issues with the visitation." Specifically, Lindeman stated that she spoke to M.W. the week before and M.W. "had said that he did not want to go over to Mom's every single weekend, that he wanted to spend some time with his dad on the weekends."  Lindeman stated that M.W. told her that A.B. had spoken disparagingly about J.W.  Lindeman testified that a home study was completed for J.W. and approved, that a study for the new apartment "was in the process," and that she had no concerns based upon her observation of the apartment the previous night.

{¶ 18}  When asked if M.W. could be reunited with A.B. within the foreseeable future, Lindeman responded, "I don't have any questions or concerns in regards to abuse, physical or criminal stuff, with [A.B.] at this present time.  My only concern with [A.B.]

would be being able to meet [M.W.'s] financial, emotional needs, making sure that he goes to school every day, providing for him." Lindeman stated that MCCS sought a grant of legal custody to J.W. because "since [M.W.] has been with [J.W.], he has maintained stable employment, stable housing. He has not been incarcerated. He hasn't received any criminal charges. He's been meeting all of [M.W.'s] needs on a daily basis since his placement with [J.W.]"

{¶ 19} On cross-examination by counsel for A.B., Lindeman stated that A.B.'s daughter, J.C., was placed in A.B.'s care in January of 2015 by the juvenile court and there have been no concerns about the child. Lindeman stated that J.C. and M.W. resided together before MCCS became involved with the family, and she testified that the children are bonded to each other. Lindeman stated that A.B. had no control over the switch of counselors at Day-Mont, and she stated "Day-Mont had switched counselors on her and did not inform her of who her new counselor was." Lindeman stated that A.B. contacted South Community on her own initiative.

{¶ 20} Lindeman stated that in the second quarter of the school year, M.W. was on the Honor Roll in Dayton Public Schools. She stated that in the third quarter "he has had some struggles. They've switched teachers and merged some schools together, so he has had some behavioral issues in the classroom." Lindeman stated that J.W. "has gone to the school, has met with the new school teacher. He has gone to the school, and sat in on a classroom." Lindeman stated that M.W.'s behavioral issue include being disruptive, talking in class, not listening and not following directions. She stated that M.W. "will be switched to Mad River City Schools because the new apartment is in Mad River."

{¶ 21} On cross-examination by counsel for J.W., Lindeman stated that A.B. is on

probation for heroin trafficking, and that she has "a federal probation officer and a Montgomery County probation officer." Lindeman stated that in the course of her mental health treatment, A.B. was diagnosed with depression. When asked if she was concerned that A.B. had not been in treatment since November, Lindeman replied, "we did not hold that against her, because it was not her fault that the treatment had ceased." Lindeman stated that she and M.W. "have spoken several times one-on-one in regards to what his wishes are, and he has stated to me repeatedly that he wishes to remain with his father and continue visitation with his mother."

{¶ 22} On cross-examination by the GAL, Lindeman testified that M.W. and J.C. "have a good time when they are together. They play together. They interact. They're the two youngest ones." When asked if M.W. has expressed a desire to reside with J.C., Lindeman responded, "No, he has not." When asked about the sleeping arrangements during visitation with A.B., Lindeman testified that M.W. "himself has told me that he gets a blanket and pillow and sleeps on the floor. He says there's been times where he would start out in the bed and then wake up on the floor." Lindeman testified that in the course of her visit to J.W.'s new apartment, M.W. was present and he "was excited. He was showing me where his room was going to be, where he was going to be able to ride his bike up and down the street. There's a pond. He was going to be able to go fishing when it was nicer. * * * [H]e was very excited about the move." Lindeman testified that M.W. has told her that he is excited about going to a new school. She stated that he "doesn't like the school he's in now. * * * [H]e feels like he's being picked on, bullied, made fun of by the teacher and the new kids that are in the school."

{¶ 23} On redirect examination by MCCS, Lindeman testified that J.W. is "getting

furniture through - - with St. Vincent and the Goodwill that he had worked at before. So he's in the process of purchasing that stuff." Again, Lindeman stated when asked about M.W.'s preferred living arrangement, that "[h]e's told me repeatedly with his father."

{¶ 24} A.B. testified that she was removed from intensive probation to basic probation "before our last hearing. I report after hours once a month for my state probation, because of work, and then for federal * * * I haven't seen her in a couple months. I text her once a week with progress reports." A.B. stated that face-to-face meetings with her federal probation officer are no longer required because of her progress. A.B. stated that she has been drug-tested "at least ten" times and that every test has been negative for drugs. A.B. stated that her counselor at Day-Mont was transferred without notice to her and that she contacted South Community and is "waiting for Day-Mont to fax over my file, and as soon as that's faxed over, there will be an appointment within a week set up."

{¶ 25} A.B. stated that there are five bedrooms in her mother's home, "and the garage was converted to another bedroom, so there's six bedrooms." According to A.B., M.W. "sleeps wherever he wants. He runs around and he plays, like until he just basically falls asleep, and wherever he goes to sleep is where he wants to sleep at." A.B. stated that there is not a bed in the home for M.W., "but there will be one for him, and he will share a room with his brothers." When asked when a bed will be provided for M.W., A.B. replied, "I would hope within the next couple weeks. I'm working on getting one."

{¶ 26} A.B. testified that she is employed at A Plus Expediting and that she "started February 2nd, 2015." A.B. stated that she works "Monday through Friday, 8:00 to 5:00." A.B. indicated that she brought pay stubs to court, and that she "as of Friday, got a 50-

cent raise." According to A.B., for "the whole month that I've been employed at A Plus, I was working there during the weekdays and at McDonald's on the weekends. So I was working seven days a week." She stated that she "came home in May, and since June I've had employment." When asked about her difficulty in obtaining independent housing, A.B. stated, "I pay almost $500 a month in child support for my oldest two children" who now reside with A.B. at her mother's home. A.B. stated that she pays the child support obligation to the children's father, and that the children subject to the obligation "haven't seen their father in two years." But for the child support obligation, A.B. stated, "I would already have my own place." A.B. testified that she anticipates obtaining independent housing in less than six months. She stated that she has "contacted a couple income-based apartments. I have been put on a waiting list for one * * * I do believe, and the rest of them's waiting lists were closed." A.B. stated that the wait time at one apartment she contacted is two years, and she is not aware of any shorter wait times. She testified that she will continue to look for housing. A.B. stated that she is looking for a three-bedroom home for her, M.W., and J.C., and that her mother is currently seeking custody of her two older sons.

{¶ 27} A.B. stated that M.W. complains to her "all the time" about his current school, that "he hates it there, that he's constantly being picked on. He tells me all the time he wants to come back to [P.] - - [P.] is the kindergarten that he went to in Kettering - - that he misses being there."

{¶ 28} A.B. testified that she raised M.W. "for six years of his life until I went to jail." When asked to describe J.W.'s involvement during that time, A.B. responded, "On and off. I would have to call a phone that would go to voice mail and wait for a return call

from [J.W.'s] girlfriend."   The following exchange occurred:

Q.  How often do [J.C.] and [M.W.] see each other?

A.  Well, now that I have custody of [J.C.], when [M.W.] is allowed to come over, just for the * * * two days on the weekend.

Q.  When you say when he "is allowed to come over," what do you mean by that?   There have been some times of no visitation?

A.  Yeah. * * *

Q.  What are the issues then?

A.  In order to see [M.W.], I literally have to start on a Monday to get a response by Friday through the Facebook Messenger, and then sometimes the answer is no, or I might not even get a response back.

This last weekend, he told me that [M.W.] couldn't come over because he was scared he was going to lose [M.W.] today, so he wanted to spend one last weekend with him.   The weekend before that, didn't get a response.

{¶ 29} A.B. stated that the only contact numbers she has "ever had" for J.W. are those of J.W.'s mother and stepfather, "which my calls never get answered or returned." A.B. denied ever yelling at J.W. The following exchange occurred:

Q.  With regards to visitation going forward, would you like the Court to have a set schedule?

A.  Absolutely, because I miss my son.   I mean, I might get to see him two days out of the month if I'm lucky.

Q.  How often have you seen him since the last court hearing?

A. * * * I've seen [M.W.] maybe three times since the last hearing.

* * *

Q. Since you've been released in May of 2014, have there been times during the week where you've had visitation?

A. Yes. * * * If he's not in school and I can get a hold of [J.W.], he does let me get him then, but since our last hearing, it has been an issue.

Q. Are you opposed to * * * legal custody being given to Father?

A. Yes. I want my son back home with me.

Q. Tell * * * the court why that is.

A. [M.W.] is my life. I wake up in the morning, I have a hard time even getting up and going because he's not there. There is a bond there from me and [M.W.] from the day he was born.

Yes, I messed up, and I went to jail, and I'm the reason why we're in this situation. But with that said, [M.W.] misses out on so much of his mom's side of the family and his brothers and his sisters (sic), and he doesn't get to be where he grew up, and I want my son home. I miss him so bad.

A.B. stated that the bond between M.W. and J.C. "has lessened because they don't get to see each other." A.B. testified that she would like them to reside in the same home. She stated that she will continue to work on her case plan objectives.

{¶ 30} On cross-examination by counsel for MCCS, A.B. stated that the garage bedroom is insulated and dry walled, and that the garage door is present but "blocked." She stated that the floor is carpeted. A.B. stated that she was renting a queen-size bed

"until I got [J.C.] back, and I let it go back because there wouldn't have been enough room for my bed and her bed, and I'd rather her have one than me." When asked about the two-year wait for an apartment, A.B. responded, "That's a waiting list. I'm - - it will be way before then before I have an apartment. As soon as I can get the custody of my oldest two switched, stopped - - the child support stopped * * * from going to their father, it will be real soon, as soon as I get that done." A.B. stated that her new hourly rate at work is $9.00 for a 40-hour week. She stated that she "was actually in training for management at McDonald's, and I stepped down from management to take A Plus's job because it's better hours, better pay, so that I went to just weekends with them at McDonald's." A.B. stated that she works from 7:00 a.m. to 3:00 p.m. on Saturday and Sunday at McDonald's.

{¶ 31} On cross-examination by counsel for J.W., A.B. stated that she is planning on moving out of her mother's home without her oldest two children. When asked if she will have a child support obligation to her mother at that time, A.B. stated that she and her mother have "a verbal agreement that I would give her money as needed or buy the kids what they need, as needed."

{¶ 32} On cross-examination by the GAL, A.B. stated that she has been residing in her mother's home for six months, and that her older children have been there the entire time. The following exchange occurred:

Q. * * * And in those six months, approximately, you've been having $500 a month taken out of your check?

A. Right.

Q. * * * And have you obtained that money back from the father?

A.   No.

Q. * * * And so a $140 filing fee is keeping you from keeping $500 a month for six months?

A.   Right.

Q.   * * * Does your mother provide you with financial assistance?

A.   No. * * * I make it from paycheck to paycheck after - - what's left after child support.

* * *

A.   * * * I do reside in her home. * * *   I don't pay any bills there.

* * *

Q.   * * * And right now you do not have any custodial rights regarding your older two sons?

A.   Before they moved back into the house, I did have court-ordered visitation.

Q.   But not custodial - -

A.   No.

{¶ 33} On redirect examination, A.B. testified that she has a child support arrearage from when she was incarcerated but that she is unaware of the amount. On recross-examination by counsel for MCCS, A.B. stated that M.W. spent two weeks with her at Christmas and that the visit "went great.  He loved being there.  We all loved having him there.   To see him and [J.C.] and his older brothers be all together like that, it was amazing." A.B. stated that she arranged the visit with J.W.

{¶ 34}   J.W. testified that M.W. has resided with him for "about a year and a few

months." He stated that M.W. has his own bed where he currently resides. Regarding the move to the apartment, J.W. stated, "I just have to get the furniture in there, you know. I've already talked to Ms. Chris from the St. Vincent de Paul, and * * * I can call and get a voucher or anything like that, * * *but they have to have the keys first, and I just received the keys maybe four or five days ago." J.W. stated that M.W will have his own bedroom at the apartment.

{¶ 35} J.W stated that he is employed doing subcontracting "with my father," and that "we've been doing this for about four or five years. I have text documents to prove I filed." According to J.W., "[w]e clean out houses. My Aunt Virginia owns a real estate company. She gives us homes to clean out * * *. We also do landscaping, and when the weather doesn't permit anything like that, we do snow removal." J.W. stated that he has supported M.W. since he has been in his home, and that he has no concerns about his ability to do so when he moves into the apartment with him.

{¶ 36} J.W. stated that he sends M.W. to school every day. When asked about M.W.'s grades dropping and his misbehavior, J.W. stated that M.W. "likes to be treated a certain way, and if he's not treated that way, then there's a problem. He has a problem with authority." J.W. stated that he has visited M.W.'s classroom and that other children there also have behavior problems, and "the teacher is dealing with so many behavior issues in that class * * * and I think that teacher is actually stressed out * * *." J.W. stated that he has also attended parent-teacher conferences, and that he discusses M.W.'s behavior with him at home. According to J.W., "we really don't have too many problems with [M.W.] except for his * * * mouth. He likes to talk back * * *. And I've tried a lot of different things to correct the behavior." J.W. testified that "spankings and things like that

doesn't really work with him. It actually makes him angry, and then the problem progresses." Instead, J.W. testified that he takes things away from M.W., and "his behavior has become a lot better since I've tried this new method of takings things away." J.W. stated, "I have [M.W.'s] Christmas gifts, but I told him, until your grades come up and your behavior changes, I'm not going to give you these things. You have to earn it."

{¶ 37} J.W. stated that "before all this occurred, when [M.W.] was in [A.B.'s] custody, she used to call [and] leave, like very belligerent voice messages * * *. * * * I just got fed up with it." J.W. stated that he provided the numbers of his parents and asked A.B. to contact him through them. He also stated that he and A.B. communicate via Facebook Messenger, and "once I expressed that * * * I wanted to be the residential parent * * * that's when everything started to go downhill."

{¶ 38} J.W. stated that he and M.W. are bonded and that they watch television, play video games together and "have fun." J.W. expressed concern that M.W. is subjected to questioning by A.B. regarding J.W.'s activities when he visits her, and he stated, "I think he needs to go over there, have a good time. When he comes back, I don't question him, you know. That stresses him out."

{¶ 39} J.W. stated that he believes a grant of custody in his favor is in M.W.'s best interest because of the number of people residing with A.B. and because A.B. is "working a lot." J.W. stated that M.W. expressed to him, "a lot of times when he goes over there, she's not there," and "there's nothing for him to do over there." J.W. expressed concern about "the choice of guys [A.B.] date[s]." He testified that he looked on A.B.'s Facebook page "and there was some guys on there that I went to school with, and I know what they do. They're drug dealers." J.W. stated that he would facilitate visitation with M.W for

A.B. "as long as when he goes, they make sure that he gets to school and his homework is done. We had a problem one time because I let him go during the weekday, and I sent him with his homework, and when he came back, the homework wasn't completed."

{¶ 40} On cross-examination by counsel for MCCS, J.W. stated that D.A. is his current girlfriend and that M.W. likes her "a lot.  He likes going over there and playing with her kids as well."

{¶ 41} On cross-examination by counsel for A.B., J.W. stated that he put down a deposit of $275.00 on the new apartment and signed a lease.  J.W. stated that his income is in pre-tax dollars which is reported at the end of each year for tax purposes. When asked about his involvement with M.W. during the period of time that A.B. was the child's custodial parent, J.W. responded as follows:

> Actually, she was dating the guy that's locked up now, and it was a lot of times to where * * * they were staying out of a hotel, and * * * she actually called my mother, and I took him to school at the Early Development Child Center.  His teacher was - - name was Ms. [B.], and me and [D.A.] made sure he got back and forth to school.

J.W. stated that at that time he "didn't have a visitation order," and "a lot of times when she got angry with me about something, I didn't see [M.W.] at all."  When asked if he was willing to provide A.B. with a phone number so that she could communicate with him directly, J.W. responded, "no problem at all.  Just long as we * * * can keep it civilized, no problems at all."

{¶ 42}  On cross-examination by the GAL, J.W. stated as follows when asked about M.W.'s wishes:

He - - he always says that he wants to stay with me, but, you know before * * * I'm going to be honest * * * it was back and forth Your Honor. First it was * * * I want to stay with you, but I want to stay with my mom. And - - and for the last few months - - I don't know what's been going on when he goes over there, maybe the questioning and things like that - - it's just been I want it to stay with you, Dad.   I want to stay with you.

J.W. said that M.W. told him that he wants to visit A.B. "every other weekend, because he wants to spend some weekends with me."

{¶ 43} In response to questioning by the Magistrate, the GAL opined that it is in M.W.'s best interest for legal custody to be granted to J.W., with unsupervised parenting time awarded to A.B. consistent with the Standard Order of Parenting Time.   At the conclusion of the hearing, A.B. and J.W. signed Statements of Understanding for Legal Custody.

{¶ 44} On April 6, 2015, the Magistrate awarded legal custody to J.W. and awarded A.B. parenting time consistent with the Standard Order of Parenting Time.   The Magistrate noted in part that A.B's residence "does not have sufficient room for the child. The father has completed his case plan objectives and has been providing care for the child for over one year."   The Magistrate noted the recommendation of the GAL.

{¶ 45} On April 14, 2015, A.B. filed objections and requested time to file supplemental objections.   She asserted that she "was informed if she did everything on her case plan reunification would occur.   Mother did successfully complete her case plan and reunification was denied." On July 7, 2015, A.B. supplemented her objections, asserting that the Magistrate "failed to acknowledge mother's recent progress in fulfilling

her case plan." A.B. asserted that she "is an ideal candidate to be given an opportunity to continue working her case plan as she was close to completing it. The caseworker even acknowledges with regards to mother her only concerns are financial and housing."

{¶ 46} A.B. asserted that the Magistrate and MCCS "both seemed to overlook the housing issues with father but held them against mother. Father lives with his parents and does not have independent housing but this did not seem to bother [MCCS]." A.B. noted that MCCS had not completed a home study at J.W.'s apartment, and that after taxes, "the rent of this apartment will be well over 50% of his income. Rent should never be more than 28% of an individual's income for them to be financially secure, especially when they are caring for another individual." A.B. asserted that in the absence of a home study and financial security "it was impossible to say father's case plan objective with regards to housing was complete." A.B. asserted that neither she nor J.W. were "in a position to be granted legal custody. M.W.'s best interest was impossible to determine at the hearing as both parties had significant ongoing issues that needed an extension to evaluate which situation was best for M.W." A.B. argued that the Magistrate's decision was "premature," and "it should be overturned in favor of another six month extension so the Court can properly evaluate which parent is in the best position for legal custody of M.W."

{¶ 47} A.B. further argued that it was within M.W.'s best interest to be with her. She asserted that she raised M.W. for the first six years of his life, and since her release from prison she "has done everything she can to reunite with M.W., and was working on independent housing at the time of the hearing. * * * M.W.'s relationship with his sister, [J.C.], is also a strong consideration in the Ohio Revised Code."

{¶ 48} MCCS responded to the supplemented objections on July 31, 2015. MCCS asserted that the Magistrate's findings of fact were supported by the testimony and the evidence. According to MCCS, the "comparison between the housing situations of Mother and Father is tenuous at best. Mother lives with nine other people in a home that does not have enough beds for all of its occupants, and Mother is forced to sleep in a twin sized bed with her daughter J.C. and M.W. is required to sleep on the floor." In contrast, MCCS asserts, "Father lives with just his parents and M.W. * * *M.W. has his own bed at his Paternal Grandparent's home * * *. Father has signed a lease and, at the time of the hearing, was in the process of moving into a two bedroom apartment for himself and M.W." MCCS noted that it was M.W.'s preference to reside with his father.

{¶ 49} MCCS argued the Magistrate's decision to grant legal custody of M.W. to J.W. was in the child's best interest. MCCS noted the bond between M.W. and J.W. and again noted M.W.'s expressed desire to live with J.W. MCCS asserted that A.B. "is currently involved in ongoing mental health treatment and this objective on her case plan is not yet complete. Father has no diagnosed mental health issues. Mother and Father are both in good physical health, however Mother does have a history of illegal substance abuse." MCCS noted that "M.W. has reported to the caseworker that Mother has spoken negatively about Father during her visits." MCCS argued that "M.W. has been flourishing in Father's care for over a year, is bonded with his Father, and wishes to live with his Father."

{¶ 50} In its "Decision and Judgment Concerning Objections to the Decision of the Magistrate," the trial court analyzed the best interest factors set forth in R.C. 3109.04(F)(1). Regarding the wishes of A.B. and J.W., the court noted that both parents

wanted to be awarded custody of M.W. The court noted that M.W. "has repeatedly indicated to the case worker that he wishes to live with his father and have visitation with his mother," and it determined that this "factor weighs heavily in favor of Father." The court noted that M.W. is bonded to J.C., A.B., and J.W. and determined that M.W.'s interaction and interrelationships with his parents "is equally balanced between both parents." Regarding M.W.'s adjustment to his home, school, and community, the court noted that four adults and five children live in A.B.'s home, and that the caseworker indicated that M.W. does not have a bed there. The court further noted that Lindeman "does not consider this portion of Mother's case plan to be complete." The court noted that three adults and M.W. resided together at the time of the hearing "but Father has recently acquired a two bedroom apartment that he is in the process of furnishing," and M.W. "has his own bedroom both at paternal grandparents['] home and at Father's new apartment." The court noted that J.W. "ensures that the child attends school each day," and that J.W. has spoken to the child's teacher and attended his class. While behavior problems arose after M.W.'s school merged with another school, it was significant to the court that M.W. was excited about moving to J.W.'s new apartment and "changing schools since the new school is located in a different school district." The court concluded that M.W.'s adjustment to his home, school and community weighed in J.W.'s favor.

{¶ 51} When considering the mental and physical health of all persons involved in the situation, the court noted that Lindeman considered the mental health component of A.B.'s case plan to be ongoing, and cited concern that A.B.'s income was perhaps insufficient to obtain independent housing due to her child support obligation. The court noted that "Father has been successful with all his case plan objectives and all of the

child's needs are being met by Father," and it concluded that this "factor weighs in favor of Father."

**{¶ 52}** When considering the parent more likely to facilitate visitation rights, the court found that this "factor weighs slightly in favor of Mother," noting, "Mother states that in the two weekends before the hearing she has not had visitation because Father did not respond to the request or because Father denied the request because he was afraid of losing custody and wanted the child with him." The court further noted A.B.'s difficulties reaching J.W. to schedule visitation.

**{¶ 53}** The court noted that there was no evidence presented that either party owed child support, or had been convicted of any criminal offense involving an act that resulted in a child being abused or neglected, or that either parent planned to establish a residence outside of Ohio. The court again noted that there were "some allegations that Father was recently denying Mother visitation." Finally, the court noted that the GAL recommended that legal custody be granted to J.W.

**{¶ 54}** A.B. asserts one assignment of error herein as follows:

THE TRIAL COURT'S (sic) ERRED IN ITS EVALUATION OF R.C. §3109.04(F)(1) BEST INTEREST FACTORS AND THE GRANTING OF LEGAL CUSTODY TO FATHER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 55}** A.B. asserts as follows:

The trial court correctly found that factors R.C. §3109.04(F)(1)(f) and (i) weighed in favor of the Mother. Both of those factors take into consideration whether one parent is attempting to interfere with the other

parent[']s parenting time. * * *

The trial court incorrectly found that R.C. §3109.04(F)(1)(b) weighed heavily in favor of Father. This factor takes into consideration the child's wishes as expressed in an in-chambers interview. * * * Nowhere in the transcript or in the trial court's Decision is there any mention of an in camera interview with the child. The trial court relied on what was allegedly told to the case worker of Father. R.C. §3109.04(F)(1)(b) is irrelevant in this case.

R.C. §3109.04(F)(1)(e) and (f) are the only remaining two factors. The trial court when evaluating these two factors relied heavily on the fact that Mother did not have stable, independent housing. However, Father also did not have stable, independent housing. Father resides with his parents also. * * * Regarding Father's new housing, the caseworker had not seen any lease. * * * Father's new housing is not furnished and is completely empty. * * * Father did not have safe, independent housing at the time * * * [MCCS] filed their motion. Father did not have safe, independent housing as of the date of the hearing. * * * It seems unfair to decide that one party has stable, independent housing and the other party does not, when both parties['] housing situation is almost identical. The trial court erred in finding these two factors weighted in favor of Father.

Looking at the R.C. §3109.04(F)(1) factors, it appears that granting legal custody to Father was inappropriate at the time. The trial court should have granted a second extension of temporary custody to allow either Mother o[r] Father to obtain stable independent housing.

**{¶ 56}** MCCS responds as follows:

> * * * While the court may not have examined M.W. in an in camera interview as part of the dispositional hearing, it could have considered M.W.'s wishes as expressed through the GAL and through father, just as it could have and in fact examined the parents' progress on their respective case plans and considered the GAL's recommendations with regard to M.W. * * * Because R.C. 3109.04(F)(1) contains a non-exhaustive list of possible factors to analyze, the court was within its discretion to consider relevant M.W.'s wishes as expressed through the GAL and Father.   Thus, the court did not err when it considered M.W.'s wishes.

> Even if this Court finds that the trial court erred in using the 3109.04(F)(1)(b) best wishes (sic) factor, any error was harmless because it does not affect the end result of the best interest analysis. Notwithstanding that factor, R.C. 3109.04(F)(1)(d), 3109.04(F)(1)(e), and 3109.04(F)(1)(i) weigh in favor of Father.   The trial court found that only R.C. 3109.04(F)(1)(f) and potentially 3109.04(F)(1)(i) weighed in favor of Mother. * * * Thus, the judgment was supported by competent, credible evidence.

> Here, the weight of the evidence presented at the dispositional hearing supports the trial court's decision.   The trial court's decision is not only based on Mother's failure to complete her case plan, but also is based on all the evidence showing that it is in M.W.'s best interest to remain with Father.   * * *

**{¶ 57}** R.C. 2151.353(A)(3) provides in part that if a child is adjudicated a

dependent child, the court may award legal custody to either parent. R.C. 3109.04 provides in relevant part as follows:

(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant

to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning

to establish a residence, outside this state.

**{¶ 58}** "A trial court necessarily has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest, and the court's determination will not be reversed absent an abuse of that discretion. *In re K.H.,* Clark App. No. 2009–CA–80, 2010–Ohio–1609, ¶ 66." *In re K.R.,* 2d Dist. Clark No. 2011 CA 39, 2011-Ohio-5694, ¶ 13. As this Court has previously noted:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc.* [*v.*] *River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990).

*Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

**{¶ 59}** As this Court further noted in *In re K.R.*, ¶ 14:

"In assessing a manifest weight challenge in the civil context, we will not reverse a judgment as being against the manifest weight of the evidence where the judgment 'is supported by some competent, credible evidence going to all the essential elements of the case.' " *In re S.S.*, Montgomery App. No. 22980, 2008–Ohio–294, ¶ 47, quoting *Gevedon v. Ivey*, 172 Ohio App.3d 567, 2007–Ohio–2970, ¶ 54, in turn quoting C.*E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279. "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. * * * This

presumption arises because the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' * * * 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate grounds for reversal, but a difference of opinion is not.' " *Id.* at ¶ 48, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007–Ohio–2202, ¶ 24.

**{¶ 60}** We agree with MCCS that the juvenile court did not abuse its discretion in evaluating M.W.'s best interest and granting custody of M.W. to J.W. Pursuant to the statutory best interest factors set forth in R.C. 3109.04, we agree with MCCS that the juvenile court's judgment is not against the manifest weight of the evidence and is supported by competent, credible evidence. While we agree with A.B. that R.C. 3109.04(F)(1)(b) applies in the event the court conducts an interview of the child in camera, and there is no indication that an in camera interview took place, we further agree with MCCS that R.C. 3109.04(F)(1) provides that the court "shall consider *all* relevant factors, *including, but not limited to*" those set forth in the statute. Lindeman testified consistently in the hearing that M.W. told her repeatedly that he wanted to live with J.W., and J.W.'s testimony and the testimony of the GAL were consistent with Lindeman's regarding M.W.'s wishes, a factor the court was free to consider in deciding M.W.'s best interest, and which we agree weighs in favor of J.W. We further note that Lindeman testified that J.W. is meeting all of M.W.'s needs and completed his case plan objectives.

Lindeman further stated that M.W. has not expressed a desire to reside with J.C., and that he is excited about the new apartment.

{¶ 61} Regarding A.B.'s assertion that the juvenile court "relied heavily on the fact that Mother did not have stable, independent housing," we cannot agree with A.B. that her and J.W.'s housing situations are "almost identical." Lindeman testified that A.B.'s case plan objective of stable, independent housing was not complete since multiple people resided in A.B.'s mother's home, M.W. does not have a bed there and sleeps on the floor, and A.B. has not established her own independent housing. We note that A.B. testified that "wherever [M.W.] goes to sleep is where he wants to sleep at." We note that A.B. testified that she does not pay any bills in her mother's home, and she further testified that she was unable to afford the filing fee to modify her child support obligation for her two older children.

{¶ 62} In contrast, Lindeman testified that J.W.'s initial home-study was completed and approved, and that while living with J.W. and his paternal grandparents, M.W. had his own bedroom. Lindeman testified that she visited J.W.'s new two-bedroom apartment the night before the hearing and determined that the utilities were working and that J.W. "does have stable and secure housing." J.W. testified that he paid a deposit on the apartment of $275.00 and signed a lease. He and Lindeman testified that J.W. intended to obtain furniture from St. Vincent de Paul. J.W. testified that he recently obtained the keys to the apartment and would be able to accordingly obtain a voucher for furniture. An abuse of discretion is not demonstrated.

{¶ 63} Since the juvenile court did not err in determining M.W.'s best interest, and its decision awarding custody of M.W. to J.W. is supported by competent, credible

evidence and is not against the manifest weight of the evidence, A.B.'s sole assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Meagan D. Woodall
Jeffrey D. Livingston
Hon. Anthony Capizzi